IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| BARBARA BUTLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 10-3522-CV-S-REL-SSA |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Barbara Butler seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in failing to give proper weight to the opinion of plaintiff's treating physician, in failing to give proper weight to plaintiff's testimony regarding her seizure disorder, and in refusing to allow counsel to question the vocational expert after listening to medical expert Dr. Lipton. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

I.    BACKGROUND

On April 10, 2008, plaintiff applied for disability benefits alleging that she had been disabled since December 31, 2000. Plaintiff's disability stems from seizures, cataracts, and allergies. Plaintiff's application was denied on May 28, 2008; and on October 22, 2009, a hearing was held before an Administrative Law Judge. The hearing reconvened on January 15, 2010. On March 26, 2010, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On May 11, 2010, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than

2

twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

IV.    *THE RECORD*

The record consists of the testimony of plaintiff, medical expert Ross Elliott Lipton, M.D., and vocational expert Terri Crawford, in addition to documentary evidence admitted at

3

the hearing.

A.     *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from 1973 through

2008:

| | | | |
|---|---|---|---|
| 1973 | $ 1,516.05 | 1991 | $ 31,889.20 |
| 1974 | 881.40 | 1992 | 34,940.24 |
| 1975 | 600.88 | 1993 | 33,183.20 |
| 1976 | 0.00 | 1994 | 34,577.00 |
| 1977 | 657.60 | 1995 | 31,980.00 |
| 1978 | 1,288.70 | 1996 | 6,820.51 |
| 1979 | 1,644.78 | 1997 | 4,466.31 |
| 1980 | 13,161.83 | 1998 | 9,721.50 |
| 1981 | 15,506.38 | 1999 | 12,642.74 |
| 1982 | 18,051.30 | 2000 | 8,362.81 |
| 1983 | 20,524.56 | 2001 | 2,240.00 |
| 1984 | 22,955.00 | 2002 | 0.00 |
| 1985 | 24,611.25 | 2003 | 3,813.01 |
| 1986 | 25,572.80 | 2004 | 1,259.20 |
| 1987 | 26,605.24 | 2005 | 0.00 |
| 1988 | 27,510.20 | 2006 | 188.84 |
| 1989 | 29,170.20 | 2007 | 299.00 |
| 1990 | 31,060.30 | 2008 | 0.00 |

(Tr. at 232, 240).

**Supplemental Questionnaire**

In a supplemental questionnaire completed on May 1, 2008, plaintiff was asked for the

medical condition that keeps her from working, and she answered seizures and cataracts (Tr.

at 256). She did not indicate that back or neck pain prevented her from working. She

reported that despite her impairments, she can do laundry, do dishes, make beds, change

sheets, vacuum, sweep, take out the trash, go to the post office, and care for her own personal

needs (Tr. at 259, 260). She cannot iron[1] because she cannot see and is afraid she will get burned if she has a seizure. She is able to shop for 30 to 40 minutes at a time (Tr. at 259). She can watch a two-hour movie, and the only difficulty she listed was that she gets headaches after about a half an hour; she did not indicate a difficulty with sitting during that two hours (Tr. at 260). She reported that no one has advised her not to drive (Tr. at 261).

**Work Activity Report**

In a work activity report dated May 2, 2008, plaintiff reported that she left her job at Amateur Softball Association in 2001 because she moved to a different part of St. Louis and did not want to drive that far for $6 an hour (Tr. at 278). She left her job at Dillards in 2004 because she was hired as Christmas help (Tr. at 279). She left her job at Macy's in December 2006 because she was hired as Christmas help (Tr. at 277). She left her cashier job at RPCS in August 2007 because she was making too many mistakes (Tr. at 277).

**B.      SUMMARY OF MEDICAL RECORDS**

Medical records prior to the relevant time period, show that in May 1997 plaintiff was involved in a motor vehicle accident (Tr. at 340-41, 346-49). After being released from the emergency room, plaintiff suffered a seizure (Tr. at 341, 347). She was admitted for observation, but had no further seizures (Tr. at 347). She was prescribed a week of Dilantin [anti-seizure medication] and told to follow up with her primary care physician; however, there is no evidence that she kept that appointment (Tr. at 348).

There is no additional medical evidence until plaintiff was seen in the emergency room after slipping on wet leaves and falling on her face in October 2003 -- more than six years after her previous emergency treatment and almost three years after her alleged onset date (Tr. at 394-424). During that fall, plaintiff got a laceration and contusion of the left cheek with a

---

[1]In a Function Report dated March 28, 2009, plaintiff indicated that she is able to iron (Tr. at 306).

Case 6:10-cv-03522-REL   Document 19   Filed 01/31/12   Page 5 of 42

tertiary diagnosis of closed head injury. On admission to the emergency room, plaintiff was said to have alcohol on her breath (Tr. at 405) and was said to have been wearing eye glasses, which was consistent with the area of injury described as mild to moderate. She was treated and released and told to see her regular physician as soon as possible or within the next two to four days for a check; however, there is no evidence that she did so.

About 2 1/2 years later, in February 2006, plaintiff was treated at the Kitchen Clinic for a previously broken foot without complete healing (Tr. at 576-577). Plaintiff claimed to drink alcohol only socially (Tr. at 577). X-rays showed a left foot fracture at the fifth metatarsal (Tr. at 576). Plaintiff was told to take a multi-vitamin; her Premarin [estrogen]; new medications Zoloft,[2] Trazodone[3] and Gabitril;[4] and Tylenol, ibuprofen and Ultram[5] for the pain associated with the fracture. The records include the following notation: "Stop smoking!" (Tr. at 572, 576).

Plaintiff returned to the Kitchen Clinic on March 9, 2006, for medication refills and to see if her foot was healing properly (Tr. at 575). She was still having foot pain but otherwise was "doing well" (Tr. at 575).

On April 14, 2006, plaintiff was treated for a puncture wound from a drill bit (Tr. at 574). She did not complain of foot pain on this visit or for the rest of the year and the first part of 2007.

On June 1, 2006, plaintiff was seen at the Kitchen Clinic complaining of a cough and chest congestion (Tr. at 573). She was still smoking.

---

[2]A selective serotonin re-uptake inhibitor used to treat depression.

[3]A serotonin modulator used to treat depression.

[4]An anticonvulsant used to treat partial seizures.

[5]An opiate agonist used to treat moderate to severe pain.

6

On June 6, 2006, plaintiff was seen at the emergency room complaining of three hours of rapid heartbeat, lung infection and a swollen calf (Tr. at 539-549). She was there less than three hours while tests were being done. Twice she unhooked herself from the cardiac monitors and left her room. The first time she went out to smoke; the second time she said she was impatient and wanted to leave. After being warned that she could die or suffer permanent harm, plaintiff left against medical advice. While in the emergency room, plaintiff was given magnesium as tests revealed she was low on this and other minerals. She had no cardiac history, but EKG results obtained after she left showed mild prior septal infarct[6] of unknown age. Her lungs were clear, and there was no further mention of her previous calf problem by plaintiff. At the time she listed depression on her medical history; however, there is no evidence of treatment for depression other than the one occasion in February 2006 when she was prescribed antidepressant medication.

On April 2, 2007, plaintiff was seen at Cox Health with headaches (Tr. at 529-537). She exhibited no motor or sensory deficits, and a head CT was negative (Tr. at 529-530, 538). She was told to follow up with her doctor or return if her headaches continued (Tr. at 531).

On May 3, 2007, plaintiff was seen in the emergency room at St. John's (Tr. at 425-478, 465). Plaintiff had been drinking heavily since two days earlier, she became dehydrated, and she had a syncopal episode [fainting]. Plaintiff told the emergency room staff that she had rapid heartbeat. She continued to be somewhat dehydrated. She was told to drink plenty of fluids and was sent home with a 24-hour Holter monitor which was normal. It did show some minor premature ventricular activity very rarely, but not in any abnormal groupings. On May 5, 2007, she was diagnosed with dehydration and syncope [fainting].

---

[6]A localized area of tissue that is dying or dead, having been deprived of its blood supply because of an obstruction.

Case 6:10-cv-03522-REL   Document 19   Filed 01/31/12   Page 7 of 42

On May 10, 2007, plaintiff was seen at Cox Hospital emergency room (Tr. at 505-511). Plaintiff said she was hit by a group of shopping carts in the Wal-Mart parking lot. Her side was exquisitely tender. On CT exam she had fatty infiltration of the liver, a liver lesion which appeared to be fibrotic, and enlarged pancreatic head. Further study of the pancreas was consistent with chronic pancreatitis, often due to chronic alcohol abuse. She exhibited full strength, normal gait, and no back tenderness (Tr. at 507). Plaintiff threatened to leave the hospital against medical advice (Tr. at 523, 525). She had no treating physician at the time and was set up with Dr. Green for a follow-up appointment.

At no time until August 4, 2007, did plaintiff mention seizure activity or a history of seizures after her initial 1997 hospitalization. On August 4, 2007, plaintiff was brought to the emergency room at Cox by ambulance for a seizure (Tr. at 488, 494-496, 502-503). Plaintiff admitted that she had been drinking alcohol but she said she had only had two drinks. Her friend described a tonic-clonic (full-body) seizure after she was in bed. Plaintiff said she had not had a seizure for more than seven to eight years and had not been on seizure medications for at least four years. Her complaints were headache and backache related to the seizure. Despite saying she had only had two drinks, blood alcohol level was very high showing alcohol intoxication at greater than .32 -- over four times the level of intoxication for arrest under the driving-under-the-influence laws. Alcohol intoxication was the first diagnosis. Plaintiff also had a urinary tract infection, which was her secondary diagnosis. Seizure was the tertiary diagnosis. Plaintiff was to see her primary care physician within a week; however, there is no evidence that she did so.

Plaintiff continued to lose weight during the above period. On September 1, 2007, plaintiff was found unresponsive and her fiancé suggested that she had a "little bit too much beer last night" (Tr. at 450). Plaintiff claimed that she drank five beers a day at most, two days a week (Tr. at 450). However, plaintiff's mean corpuscular volume ("MCV") was "quite high"

8

and suggested otherwise (Tr. at 450-451). Her alcohol level was "high at 32" (Tr. at 447, 450). She required transfer to the ICU due to delirium tremens (Tr. at 447, 451). Plaintiff was assessed with severe alcoholic ketoacidosis,[7] alcoholism, delirium tremens,[8] and severe dehydration (Tr. at 447, 451). She was hydrated aggressively and given multi-vitamins, folic acid and thiamin. In addition, due to alcohol abuse and possible withdrawal-related seizures, seizure precautions were initiated along with alcohol withdrawal applications. She was prescribed Ativan as part of "detox" protocol.

All of plaintiff's symptoms resolved after five to seven days of appropriate nutrition, mineral supplementation and no alcohol. She had apparently been drinking to such excess that she had barely been eating or drinking any other fluids. While plaintiff was hospitalized other testing was done, such as myocardial perfusion imaging, which was entirely normal. All lung issues were resolved except mild hyperinflation due to years of smoking.

Plaintiff was seen in the emergency room on September 26 and 27, 2007, with a laceration to her forehead (Tr. at 431-445). Plaintiff said her fiancé told her they were walking down the street and plaintiff fell to the ground with a seizure (Tr. at 436). Plaintiff's fiancé was not in the emergency room when she was evaluated by a doctor (Tr. at 436). Plaintiff stated that she had not had any alcohol for the past 25 days, or since she was treated for severe alcoholic ketoacidosis (Tr. at 436). Her blood alcohol test was negative; however, a urine drug screen was positive for benzodiazepine although plaintiff claimed not to be on any medication (Tr. at 436, 438). Plaintiff claimed to have had two seizures prior to the last one

---

[7]Usually caused by a recent history of binge drinking, little or no food intake, and persistent vomiting. Fat is used as fuel. Byproducts of fat breakdown, called ketones, build up in the body. In high levels, ketones are poisonous.

[8]A severe form of alcohol withdrawal that involves sudden and severe mental or nervous system changes. Delirium tremens can occur when one stops drinking alcohol after a period of heavy drinking, especially if the person does not eat enough food.

9

that brought her in to the hospital three weeks earlier, when she was treated for alcoholic ketoacidosis (Tr. at 437). A CT scan of the head and cervical spine were normal (Tr. at 438). Plaintiff was assessed with seizure disorder, negative alcohol in the system times 25 days since the last admission, and ischemic electrocardiogram (Tr. at 438). Plaintiff was admitted for a day while the doctors ruled out a heart attack and coronary artery disease. She was also given IV Dilantin. Chest x-rays were normal (Tr. at 442). Cardiac stress test was normal (Tr. at 444). Plaintiff's discharge diagnoses were seizure disorder, recovering alcoholic and scalp laceration (Tr. at 433). She had no seizures while in the hospital, and her hospital stay was described as "unremarkable" (Tr. at 433). She was instructed not to drive for six months (Tr. at 433).

Despite plaintiff's assertion that she had not had anything to drink prior to her seizure on September 26, 2007, it appears that plaintiff consumed alcohol the day she went to the hospital on September 26. On October 6, 2007 -- nine days after her discharge on September 27 -- she was seen at the Kitchen Clinic and claimed that she had not had any alcohol for the past ten days (Tr. at 567). This means that plaintiff's last alcohol consumption was September 26, 2007 -- the day she went to the emergency room with a laceration on her forehead after claiming to have had a seizure and after claiming to have been alcohol-free that day and for the previous three and a half weeks. Her scalp laceration had healed well and she had the stitches removed (Tr. at 567). She did not report having had any seizures since her hospital stay. Her weight had dropped to 89.4 pounds. She was still smoking. She was assessed with seizure disorder and alcohol dependence. The doctor prescribed pre-natal vitamins to help plaintiff get proper nutrition despite an improper diet.

On November 16, 2007, plaintiff returned to the Kitchen Clinic to get a refill of Dilantin which she said she had been out of for the past week (Tr. at 566). She reported having had no seizures since her September 2007 hospitalization, and the doctor noted that

10

her seizures were "related to ETOH withdrawal?" (Tr. at 566). Plaintiff's weight was 91.2 pounds.

On December 14, 2007, plaintiff was seen at the Kitchen Clinic for lab results and with complaints of cold symptoms (Tr. at 565). Plaintiff was still smoking: "not ready to quit" (Tr. at 565). She was assessed with acute bronchitis, "smoker - not ready to quit", and "seizure related to ETOH".

On December 26, 2007, plaintiff spoke with someone at the Kitchen Clinic and stated that she was still coughing but had finished her antibiotics (Tr. at 564). The notes indicate that plaintiff was told to return if her cough persists and to "quit smoking!" (Tr. at 564).

Plaintiff was seen on April 14, 2008, at the Kitchen Clinic for follow up on "presumed post-traumatic epilepsy" (Tr. at 562). The doctor diagnosed "post-traumatic epilepsy, generalized convulsive in remission." Plaintiff's EEG was normal, and her exam was normal except she was found to have gait ataxia.[9] No alcohol testing was done.

On May 8, 2008, plaintiff was seen at the Kitchen Clinic complaining of a mole she wanted removed (Tr. at 561, 578). Plaintiff mentioned that she was feeling depressed, and she was given Zoloft. Plaintiff had previously been diagnosed with chronic obstructive pulmonary disease related to smoking and had been strongly admonished to quit smoking. On this date she expressed an interest in quitting and was given medication to quit smoking including Nicorette. The mole was excised on May 29, 2008 (Tr. at 606).

On May 27, 2008, Elissa Lewis, Ph.D., completed a Psychiatric Review Technique and found that plaintiff's mental impairment is not severe (Tr. at 593-603). In support of her findings, she noted that plaintiff did not allege a mental impairment in her applications for disability benefits, she did not report any treatment or medications for a mental impairment,

---

[9]An unsteady, uncoordinated walk, employing a wide base and the feet thrown out.

her medical records show that she said she was feeling depressed on May 8, 2008, and that she had done well on Zoloft in the past, and she did not report any functional limitations related to depression or any other mental impairment (Tr. at 603).

On July 9, 2008, plaintiff was seen at the Kitchen Clinic for a routine physical examination (Tr. at 713). She reported that her last seizure had been in September 2007 - when she was hospitalized for alcoholic ketoacidosis. "No new complaints today." Plaintiff did complain of a cataract forming on her right eye. She weighed 92.2 pounds. On exam plaintiff's muscle tone was normal, she had full range of motion and normal sensation. Her gait was normal. Plaintiff continued to smoke. She was referred to an opthomologist.

On Wednesday, August 13, 2008, plaintiff returned to the Kitchen Clinic (Tr. at 712). She reported that she had had a seizure the previous Sunday (August 10) during which she "froze up" and had tight fists for about 15 minutes. This was apparently witnessed by her fiancé. The doctor noted plaintiff smelled "strongly" of alcohol and noted "it's 11 am!" Plaintiff claimed to have had alcohol the night before for the first time in six months, and said that she had consumed four beers. Plaintiff told the doctor that her seizure happened prior to her alcohol relapse. Plaintiff was told to stop drinking.

On September 16, 2008, plaintiff returned to the Kitchen Clinic for a routine follow up (Tr. at 707). The doctor wrote "⊕ osteoporosis" but this is listed in the section reserved for complaints; therefore, it is unclear whether this is a complaint or a finding. Plaintiff was told to stop smoking and stop drinking. Plaintiff was assessed with anxiety, chronic obstructive pulmonary disease/smoker, osteoporosis "see above", and sustained hypertension.

On September 29, 2008, plaintiff had a bone mineral density test done (Tr. at 720). The indications were listed as alcoholism, amenorrhea [missed menstrual periods], early menopause, family history of osteoporosis, low body weight, and tobacco use. Plaintiff was

Case 6:10-cv-03522-REL   Document 19   Filed 01/31/12   Page 12 of 42

considered osteoporotic according to World Health Organization guidelines with a high fracture risk.

On October 14, 2008, plaintiff had an eye exam and was diagnosed with cataracts (Tr. at 623-626). She had surgery on October 28, 2008, with good results.

On January 6, 2009, plaintiff was seen at the Kitchen Clinic for a refill of medication (Tr. at 703). The doctor noted that plaintiff smelled of alcohol at 9:45 a.m. When confronted about this, she claimed to have been abstinent since New Years. The doctor asked plaintiff if she was going to try to return to abstinence. She said, "I think so." She requested an increase of Buspar for anxiety. The doctor noted that laboratory findings were abnormal and surmised that this was due to alcohol intake. Plaintiff described low back pain, and the doctor prescribed Naproxen, a non-steroidal anti-inflammatory.

On February 3, 2009, plaintiff returned to the Kitchen Clinic (Tr. at 751). Her blood pressure had improved. Plaintiff was still smoking.

On May 4, 2009, plaintiff returned to the Kitchen Clinic for a follow up (Tr. at 753). She complained of anxiety and insomnia. She indicated that she wanted to quit smoking and had been abstinent from alcohol. She was given a nicotine patch protocol.

That same day, Kenneth Bowles, Ph.D., completed a Psychiatric Review Technique finding plaintiff's mental impairment non-severe (Tr. at 732-742). In support he noted that plaintiff had not alleged a mental impairment, did not report treatment or medication for a mental impairment, she reported to her doctor once that she was feeling depressed and that she had done well on Zoloft in the past, she did not report any functional limitations related to depression or any other mental impairment, she continued to abuse alcohol, records showed that she denied alcohol use despite smelling of alcohol during a morning doctor appointment (Tr. at 742).

13

On June 4, 2009, plaintiff returned to the Kitchen Clinic for medication refills (Tr. at 756). Plaintiff reported that she had started vomiting eight weeks earlier but later the symptom continued as diarrhea. She surmised that it was due to having eaten at a local restaurant where a health inspector found three violations in food preparation.

Plaintiff continued being seen at the Kitchen Clinic through January 2010 without complaint (Tr. at 753, 756, 758, 760, 762, 768, 772). Plaintiff reported no seizures and specifically denied any seizures on October 9, 2009 (Tr. at 753, 756, 758, 760, 762, 768,772). She did not report any lower back pain (Tr. at 753, 756, 760, 762, 768,772).

Plaintiff participated in counseling services at Kitchen Clinic between June 2009 and January 2010 for problems with her boy friend and a desire to quit smoking (Tr. at 757-758, 761, 777-778, 781-782). In June 2009, she admitted to drinking three to four beers a day once or twice a week (Tr. at 757). She was looking for work but was having difficulty finding a job due to the recession (Tr. at 757-759, 777, 781). Plaintiff said she wanted to return to work but she was concerned about transportation issues (Tr. at 759, 781). Plaintiff's counselor encouraged her to return to work as a substitute teacher and to apply for other jobs (Tr. at 759, 781). Plaintiff said she wanted to get disability benefits so that she could move out of her boyfriend's home (Tr. at 757, 770-771). In November 2009 she expressed ambivalence about whether to get a job or pursue disability, but she was certain that she did not want to continue living with her boyfriend because he was not fulfilling her needs. She had no diagnosed mental impairment in the counseling notes of Christopher Neumann, Ph.D., or therapist Michaela Muehlbach, M.A. Plaintiff's final disability hearing was on the Friday after her January 12, 2010, appointment. Her therapist was leaving the clinic, and plaintiff said she did not want another appointment made -- that she would make an appointment later if she wanted to continue counseling (Tr. at 767). Plaintiff was oriented and exhibited adequate concentration, attention and memory (Tr. at 758-759, 767, 770-771, 777-778, 781-782). In

14

January 2010 plaintiff admitted that yoga had been helpful for her back and neck pain (Tr. at 767).

Meanwhile, on October 9, 2009, Judith Dasovich, M.D. -- plaintiff's treating physician at the Kitchen Clinic -- completed a Medical Source Statement (Tr. at 764-765). She found that plaintiff could lift less than ten pounds even occasionally, stand or walk for less than two hours per day, sit for less than six hours per day and must periodically alternate sitting and standing to relieve pain or discomfort, and was limited in her ability to push or pull with her lower extremities due to severe low back pain. She found that plaintiff could never crouch or handle; occasionally climb, balance, stoop, kneel, crawl, finger, or feel; and could frequently reach in all directions including overhead. She explained that plaintiff had knee pain with crouching, and that she had difficulty reaching overhead with weight due to lower back pain. She did not explain why plaintiff could never handle. She found that plaintiff should avoid all exposure to fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery, dangerous equipment and heights. Plaintiff should avoid even moderate exposure to humidity and vibration, and she should avoid concentrated exposure to extreme temperatures, wetness and noise.

C.    *SUMMARY OF TESTIMONY*

During the October 22, 2009, hearing, plaintiff testified as follows:

Plaintiff testified that she lives in an apartment with a roommate[10] who does not work because he is disabled (Tr. at 123, 124). Plaintiff helps him walk around and she cleans and cooks for him (Tr. at 123, 124). When asked to explain what she does all day, plaintiff said:

A.    Alternate sitting and standing. That's the only way -- yeah.

Q.    That's what you do all day? Help me out to understand.

---

[10]Plaintiff testified this is the same man who helped her to the hospital in 2007, and in the medical records he is referred to as her fiancé (Tr. at 127).

A.    Basically, I sit and read.

(Tr. at 124).

Plaintiff said she has to get up about every 40 minutes (Tr. at 125).  Standing up helps her back, but it hurts her leg and hip (Tr. at 125).

Plaintiff was smoking a pack of cigarettes per day about two months before the hearing but had cut down to about five cigarettes per day (Tr. at 126).  She was 5' 1 1/2" tall and weighed about 92 pounds (Tr. at 137).

Plaintiff alleges she has been disabled since 2000 (Tr. at 129).  She worked in 2007 doing Christmas help as a salesperson (Tr. at 129).  When asked how that went, she said, "Oh, it was fine.  I'd, I'd be hurting, but--" (Tr. at 129).  Plaintiff worked for a short time at Price Cutters in 2006, and she earned $1,200 in 2004 doing seasonal work at Dillards (Tr. at 130-131).  Plaintiff was on her feet all day at those jobs (Tr. at 131).  Plaintiff worked at McDonnell Douglas for 18 years until she was laid off in 1997 (Tr. at 132).  When asked why she thought she could not go back to work, plaintiff said her counselor believed she had not properly mourned the loss of her job (Tr. at 132).  Plaintiff said she would love to go back to her old job at McDonnell Douglas (Tr. at 132-133).  When asked if she could physically do it, plaintiff said, "I don't know." (Tr. at 133).  When asked if she could do a job where she would sit most of the day and would not have to lift anything more than ten pounds, she said she did not know if she could do it because her back is "screwy" (Tr. at 133).  Plaintiff said she has been wearing a back brace for 15 years (Tr. at 134).  Her back hurt when she vacuumed recently, and it hurt when she tried to move a bucket of water (Tr. at 134).  Plaintiff testified that no one has ever suggested physical therapy because she has never mentioned back pain to any doctor (Tr. at 135).  She said she is afraid of what they will tell her (Tr. at 135).

Plaintiff had cataracts removed which was "wonderful" (Tr. at 135).  She said she does not ever remember seeing as well as she can now (Tr. at 135).

16

Plaintiff testified that her Prozac is not working because she is still depressed, but she has no side effects from any of her medication (Tr. at 137).

Plaintiff testified that she had not consumed alcohol in the past nine months (Tr. at 131). When asked how she was able to do that, she said, "I just got sick of it." (Tr. at 131).

Plaintiff said she thought she had had two "silent" seizures the month of the hearing (Tr. at 136). She said she freezes up, people say they cannot get her hands undone, and she is "out of it" for three hours afterward (Tr. at 136). She has at least one grand mal seizure per month, and sometimes two (Tr. at 138). She flops around and once was told that she foams at the mouth (Tr. at 138).

When plaintiff testified that she had regular grand mal seizures, the ALJ stopped the hearing: "I was not aware of the grand mals. All right. The hearing is adjourned, we're recessed until we can get an ME [medical expert], and we'll start over completely." (Tr. at 139).

During the Friday, January 15, 2010, hearing, plaintiff, medical expert Ross Elliott Lipton, M.D., and vocational expert Terri Crawford testified.

1. **Plaintiff's testimony.**

Plaintiff's seizures began in 2001 after she was in a car accident (Tr. at 56). Initially she had seizures about once every six months (Tr. at 57). Plaintiff testified that her last seizure was "last Wednesday" which would have been January 13, 2010, or two days before the hearing (Tr. at 42). The seizure lasted about three minutes (Tr. at 42). She has the seizures about once a week now (Tr. at 43, 57). Plaintiff has a grand mal seizure about once every three to four weeks (Tr. at 57). It takes plaintiff 15 to 30 minutes to recover from a small seizure (Tr. at 57). A grand mal seizure will knock plaintiff out for the rest of the day, and sometimes the following day as well (Tr. at 58). Plaintiff usually has seizures during the daytime (Tr. at 58). Plaintiff's doctor has not referred her to a specialist; she saw a neurologist

17

about two and a half years earlier but otherwise just sees her regular doctor (Tr. at 43). She has been on the same medicine for her seizures for two and a half years (Tr. at 60). Her dosage has not been changed for a year and a half (Tr. at 76). She was asked, "And has that been effective for you?" to which she answered, "Pretty much so." (Tr. at 60). Her attorney asked her again, "But my question is how effective has that been for you" to which plaintiff responded, "Pretty good." (Tr. at 60).

No doctor has ever mentioned plaintiff's drinking being the cause of her seizures (Tr. at 58). They said drinking might exacerbate her seizures, but it does not cause them (Tr. at 58).

Plaintiff gets counseling from a therapist about every two weeks for a half an hour (Tr. at 44). Plaintiff testified that she had not had any alcohol for the past year (Tr. at 44). Then she testified that about six months earlier, she had some alcohol because she had "slipped" back to drinking for about two days (Tr. at 45, 59). Plaintiff testified that she was down to four or five cigarettes per day (Tr. at 45). She cut down about nine months previously, or in March 2009 (Tr. at 45-46). When the ALJ asked how she was doing now that she had stopped drinking and significantly cut down on smoking, plaintiff said, "Good. Oh gosh, my whole attitude, my whole depression." (Tr. at 46).

Plaintiff described her back pain as severe (Tr. at 46). Plaintiff still had not gone to a doctor about her severe back pain because she was too nervous (Tr. at 47). Plaintiff also has neck pain that "freezes her" when it comes on (Tr. at 48). When that happens, she cannot do anything (Tr. at 48-49). Plaintiff's doctor thought it was muscular and recommended yoga exercises (Tr. at 49). Plaintiff has trouble lifting and moving a vacuum cleaner (Tr. at 49). She has trouble lifting her cat's litter box, groceries full of heavy items like sugar and milk, a sack of potatoes (Tr. at 50). Plaintiff does not have trouble walking, but she needs to alternate standing and sitting (Tr. at 50). She can stand for about 15 minutes at a time; she does not have trouble sitting (Tr. at 51).

Plaintiff would need a job where she could sit and stand at will, likely every 15 minutes (Tr. at 52). She could do that for about an hour before needing to lie down (Tr. at 52). She would have to lie down for about ten minutes to recuperate (Tr. at 54). When asked whether her seizures or her back pain is a greater deterrent to working, plaintiff said she thought it was even (Tr. at 62).

Plaintiff has chronic obstructive pulmonary disease (Tr. at 62). She coughs uncontrollably and gags sometimes (Tr. at 62).

Plaintiff has a masters degree in education (Tr. at 54).

On a typical day, plaintiff will try to take a walk for about a block (Tr. at 63). After a block, she rests then turns around and goes back (Tr. at 63). Plaintiff does the grocery shopping, and when asked whether she can drive, she said, "Sure." (Tr. at 64). When asked whether she has any problems driving, plaintiff said that if she has to drive a long way, like to St. Louis, she may squirm some (Tr. at 64). For entertainment she watches television and reads (Tr. at 64).

Plaintiff said she wishes she could work, but she is afraid she would have a seizure in the middle of something (Tr. at 65).

Plaintiff was asked to describe a silent seizure (Tr. at 71). She said she does not frittle around; she does not flop that bad; she just sits and becomes "super tense" and is not conscious of it (Tr. at 71). She does not function, but she does not lose consciousness (Tr. at 71). She has no memory of the seizure, however (Tr. at 72). Afterward she feels out of sorts and it takes a couple minutes to regain her bearings (Tr. at 73). Plaintiff was then asked by the medical expert to describe what she refers to as a small seizure:

Q.    And the small seizure, how do you distinguish the small from the silent?

A.    I just distinguish that between the amount of time I have it.

Q.    So you're saying the small seizure is like the silent but it's longer?

19

A. It's, it's, I would say it's more like, no, I don't want to say that. Kind of like, it's more a grand mal than it is a silent seizure. But it's not as long in duration as the what I call a small seizure.

Q. Could you describe a typical small seizure then?

A. Oh.

ALJ: Describe it please, Ms.

A. Well, it's the same as like I'm, I'm out of it, you know, in moving around for, anywhere from like, usually it's two minutes to five minutes. And then that's it. I mean you know, then I'm.

Q. So you, you lose consciousness.

A. Uh-huh.

Q. And you're jerking around?

A. Uh-huh.

Q. And then when you stop jerking, it takes you a while to wake up or?

A. I wouldn't, well I come out of it, but I'm not --

Q. You're out of sorts?

A. Yes.

(Tr. at 73-74).

Plaintiff does not know whether anyone is able to talk to her during a seizure (Tr. at 75).

All of plaintiff's seizures come on without warning (Tr. at 75).

2. **Medical expert testimony.**

Medical expert Ross Elliott Lipton, M.D., testified at the request of the Administrative Law Judge. Dr. Lipton is board certified in clinical neurology, clinical neurophysiology, pain medicine, pain management, disability and impairment, and national boards (Tr. at 70).

The ALJ identified the following conditions which existed for at least 12 consecutive months: epilepsy, alcohol abuse, and chronic obstructive pulmonary disease (Tr. at 83).

20

Plaintiff's other conditions do not meet the 12-month criteria (Tr. at 83). There was virtually no mention of back pain in plaintiff's medical records (Tr. at 83). Dr. Lipton testified that plaintiff's medical records show a distal branch coronary dysfunction which existed for more than a year which may not be causing any heart dysfunction, but it exists (Tr. at 84).

Epilepsy is a condition in which unprovoked seizures are suffered (Tr. at 95). When one tenses up on both sides of the body and loses consciousness, that describes generalized convulsions (Tr. at 95). However, when someone is not born with a seizure problem and suffers seizures that start from head trauma, it usually focuses in one part of the brain (Tr. at 95). Dr. Lipton was not certain how to characterize plaintiff's seizures because they apparently started from head trauma but she testified that they are generalized since she tenses on both sides of her body and loses consciousness (Tr. at 95-96).

Dr. Lipton testified that the medical records are not consistent with plaintiff's testimony regarding her seizures (Tr. at 87). He said he could not be 100% certain that her seizures were complex partial before evolving into a generalized convulsive seizure, which is what he suspects, because there was never any clinical description of her seizures and no one besides her fiancé ever saw her have a seizure (Tr. at 87-88). Dr. Lipton noted the difference between provoked seizures (due to alcohol) and unprovoked seizures, which would bolster the diagnosis of epilepsy (Tr. at 88). The records show one instance of an unprovoked seizure in September 2007 after what she claimed was one month of alcohol abstinence (Tr. at 88). Dr. Lipton also noted that the medical records refer to about a dozen seizures reported by plaintiff, whereas her seizure log, prepared for her disability case, shows a significantly greater number of seizures (Tr. at 88-89).

Dr. Lipton pointed out that there were several CT scans, but those showed only an alcohol and/or nutritionally based atrophy of the brain; there was no obvious abnormality, such as a malformation or an old stroke (Tr. at 89). He noted that treatment for epilepsy is not

21

well elaborated in the medical records (Tr. at 89). There are two instances when plaintiff was put on Dilantin in the hospital, "but the documentation of medication use is generally poor" (Tr. at 89). He also testified that the manner in which plaintiff was given Dilantin suggests that she had not been on seizure medication for a significant period of time (Tr. at 89). He surmised that was because she had only had one seizure (Tr. at 89). Although plaintiff testified about taking Lamictal for years, the medical records do not include information about her Lamictal treatment (Tr. at 90).

In order to meet Listing 11.02 for convulsive epilepsy, one must have a documented detailed description of a typical seizure pattern, including all the associated phenomena (Tr. at 97). In this case, Dr. Lipton testified that there were "some holes" in terms of defining plaintiff's seizures (Tr. at 97). Additionally, in order to meet the listing, the seizures must occur more frequently than once a month despite having been on prescribed medication for at least three months (Tr. at 97). If the seizures are occurring at the listed frequency, the medical records must include consideration of the serum drug levels, and those are not in any of plaintiff's medical records (Tr. at 97). Therefore, according to Dr. Lipton, plaintiff does not meet or equal a listed impairment for epilepsy (Tr. at 97, 110).

When a patient reports a seizure, the doctor should optimize the dose of one medication by continuing to increase the dose to the point where a maximum suggested dose is reached, or where the patient begins to get side effects, or where the seizures cease completely (Tr. at 98). Plaintiff's testimony that she has been on the same dosage of the same medication for a year and a half and is still having frequent seizures is not consistent with treatment for seizures (Tr. at 98-99). If the patient is still having seizures and the optimal dose has been reached or the patient is experiencing side effects, then a second medication should be added (Tr. at 99). The doctor must consider how the second medication affects the metabolism of the first, and the drug combination must be considered as well as the patient's electrolytes (Tr. at 99). A patient

22

may need to take magnesium and vitamin D due to side effects and to stabilize some of the electrolytes (Tr. at 99). There are many considerations in seizure treatment, and the medication records do not show whether plaintiff was on an optimal dose of medication for three months, regardless of whether she experienced as many seizures as she claims (Tr. at 99).

Dr. Lipton testified that if plaintiff's seizure log is accurate and she is still driving (as she testified), that is inappropriate (Tr. at 106). Dr. Lipton did not see anything in the medical records indicating that plaintiff's seizure activity would preclude her from working (Tr. at 106).

The ALJ noted that Dr. Dasovich felt that she was treating plaintiff optimally, since she did not change plaintiff's medication or dosage for a long period of time (Tr. at 100). Yet she assessed plaintiff's functional ability as severely restricted (Tr. at 100-101). Dr. Lipton testified that the exertional and postural limitations found by Dr. Dasovich based on severe lower back pain are supported by "absolutely no evidence in the record to even address this." (Tr. at 101). Overhead reaching and heavy lifting can hurt the neck, and plaintiff did have multiple head trauma and complained twice of neck pain, so Dr. Dasovich's findings as to plaintiff's limitations in those areas may be reasonable (Tr. at 101). Because plaintiff is very thin and perhaps nutritionally deficient, Dr. Lipton believed that the lifting restriction is not unreasonable (Tr. at 102). He explained that if there are two instances in the record when the plaintiff complained of neck pain, then perhaps there were other times in between when heavy lifting may have hurt her neck (Tr. at 103). The limitations on handling and fingering are not reasonable (Tr. at 102).

Plaintiff's alcohol abuse, which should be considered a distinct impairment, has not caused any limitations -- there was only one exam that suggested a problem with balance, but no longitudinal issue of gait and balance and she had no mental impairment due to alcohol use

(Tr. at 90).  The only mention in the medical records of any problem with mentation or cognition was associated with ketoacidosis, which is an acute problem from alcohol, not a chronic problem from the effect of alcohol on the brain (Tr. at 96).

Plaintiff's chronic obstructive pulmonary disease should also be considered a severe impairment (Tr. at 90).  Her heart condition should also be considered a severe impairment (Tr. at 91).  Plaintiff's chemical stress test suggested distal branch coronary artery problems, but this was not verified by angiogram and her heart function appears otherwise closer to normal (Tr. at 91).

3.   Vocational expert testimony.

Vocational expert Terri Crawford testified at the request of the Administrative Law Judge.  She testified that plaintiff's past relevant work includes sales clerk, D.O.T. 290.477-014; office manager, D.O.T. 169.167-034; teacher, D.O.T. 091.227-010; and computer programmer, D.O.T. 030.162-010 (Tr. at 115).

The first hypothetical involved a person who could perform sedentary work and could occasionally climb stairs, could never climb ropes or ladders; could less than occasionally balance, stoop, kneel, crouch, or crawl.  The person could crouch to pick something up; she could frequently reach but not over shoulder height except  as necessary to take something out to assist with sedentary work; frequently handle, finger, feel, grip and grasp.  She could not use air or vibrating tools or motor vehicles; she could not work at unprotected heights or around moving machinery; she must avoid concentrated exposure to dust, smoke, or fumes.  The person could work in an office environment and an assembly environment but would need to be five yards from the machine that generates the smoke or fumes.  She could not work in temperature extremes or humidity (Tr. at 115-117).  The vocational expert testified that such a person could work in plaintiff's past relevant positions an office manager or computer programmer (Tr. at 117).

24

The second hypothetical was the same as the first except the person could stand less than two hours per day, sit less than six hours per day, must alternate standing and sitting every 15 minutes, and after doing that for one hour would need to rest for ten minutes (Tr. at 117). The vocational expert testified that such a person could not work (Tr. at 117). This second hypothetical was based on the opinion of Dr. Dasovich, plaintiff's treating physician (Tr. at 118).

Plaintiff's attorney asked the vocational expert the following question:

I guess there is this one question. The judge basically set forth the restrictions on 17F [Dr. Dasovich's opinion]. You saw that? That's the basis for your last – . But one quick question. You heard the doctor's testimony, correct? I wasn't clear on his testimony on, well strike that. Based on this testimony, would any of the jobs that you've mentioned be available?

(Tr. at 118).

The ALJ said, "I'll direct the witness not to answer that, since he is indeed a medical expert. It covered a wide range of subjects, and it's beyond the expertise of this witness. But counsel, you may rephrase." The attorney refused to rephrase the question, and the hearing concluded (Tr. at 118-119).

## V.    *FINDINGS OF THE ALJ*

Administrative Law Judge James Gillet entered his opinion on March 26, 2010 (Tr. at 12-31). The ALJ found that plaintiff meets the insured status requirements only through September 30, 2007 (Tr. at 14).

Step one. Plaintiff has not engaged in substantial gainful activity since December 31, 2000, her alleged onset date (Tr. at 14).

Step two. Plaintiff has the following severe impairments: alcohol abuse in claimed remission since June 2009; partial complex seizure disorder; generalized convulsive seizure

25

disorder; emphysema; chronic obstructive pulmonary disease; bibasilar atelectasis;[11] nicotine abuse; fracture of the 5th metatarsal of the left foot; and untreated depression (Tr. at 14).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 14). Plaintiff's alcohol abuse meets Listing 12.09 A and B considered under Listing 12.04 (Tr. at 14). When she is abusing alcohol, she has anhedonia, appetite disturbance with change in weight, sleep disturbance and difficulty concentrating or thinking (Tr. at 15). When plaintiff is abusing alcohol, she is noncompliant with treatment (Tr. at 15). When she is not abusing alcohol and is complying with treatment, plaintiff has no more than mild limitations in any paragraph B category (Tr. at 15).

Step four. The ALJ analyzed plaintiff's credibility and found that her subjective complaints are not credible (Tr. at 24-29). He also gave little weight to the opinion of Dr. Dasovich as the opinion is unsupported by medical records and was completed at the request of plaintiff (Tr. at 30). He then found that plaintiff retains the residual functional capacity to perform sedentary work with occasional stooping, crouching, kneeling, crawling, balancing and climbing stairs and ramps (Tr. at 23). She can never climb ladders, ropes or scaffolds. She can frequently reach up to shoulder height, and she can frequently handle, finger, feel, grip and grasp. She can reach above shoulder height once per day if necessary but not as part of a regular job function. She cannot use air or vibrating tools or motor vehicles. She cannot work at unprotected heights or on moving machinery. She should avoid concentrated exposure to airborne irritants such as dust, smoke or fumes. She should not work in temperature extremes of cold, heat or humidity. She can carry out instructions up to the svp level of 8 or 9 (Tr. at 23). With this residual functional capacity, plaintiff can return to her past relevant work as an office manager or a computer programmer (Tr. at 30).

---

[11]A collapse of tiny air pockets in the lungs.

26

## VI.   CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A.   CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to

27

relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

There is no complaint of, or diagnosed impairment that could reasonably cause lower back pain in the extensive medical record. Therefore, the testimony regarding the limitations associated with this alleged symptom and any alleged associated symptoms, does not meet step one of the above test, and will not be considered further. This was the conclusion of the undersigned based upon review of the record, and the opinion of the qualified and thorough medical expert and neurologist. She complained on two occasions of neck pain, and on one occasion of associated upper back pain, and received a medication for moderate pain after an injury, and did not have complaints after this one treatment request. In fact, she stated the recommendation for yoga was already helpful after a couple of weeks of exercise. Therefore, it appears she responded well to the exercise and a one-time non-narcotic pain medication. No other mention was made of back pain of any kind despite multiple and regular treatment opportunities both before and after this occasion. However, the benefit of the doubt was given to the claimant in the most reasonable manner, to place her with work restrictions that would prevent any possible exacerbation of neck pain in the future, as such pain is possible with a head injury. These same precautionary limitations would also protect her back, both upper and lower, from insults, or injuries that would cause or renew low back pain if it has been a problem at any time during the period at issue.

Although the claimant's malnutrition and status of being routinely undernourished has originated with alcohol abuse, it remains after the acute effects of alcohol have subsided, and has intermittently, but somewhat frequently been diagnosed throughout the extended period at issue. The claimant's statements regarding sobriety and abuse of alcohol are inconsistent when related [to the medical records]. However, she has remained quite thin throughout, with extreme thinness, malnutrition and anorexia intermittently due to admitted alcohol abuse, and significant loss of weight with resultant health issues, at other times when she has failed to admit alcohol abuse. However, even when she fails to admit alcohol abuse, the record strongly indicates that such abuse is present by way of laboratory reports indicating abuse, or later admissions of the claimant to mental health providers that she was abusing alcohol at the previous time.

At the October 22, 2009, hearing, the claimant testified that she lives with, and helps care for her disabled roommate in an apartment. She does the cooking. She testified that she helps with the household chores, and she spends a lot of time sitting and reading. She said she had to move about every 45 minutes and alternate sitting and standing, with more difficulty standing due to back pain. She testified that she had an MRI within the last 3 years, implying it was for back pain. She testified that all of these limitations were due to back pain. However, she admitted she had not mentioned that she had back pain to her long-term treating physician, stating she was afraid to tell her about her back pain. However, she had not been afraid to tell the treating physician

Case 6:10-cv-03522-REL   Document 19   Filed 01/31/12   Page 28 of 42

about any of her other concerns, including a mole on her stomach and multiple other issues, including the very rare (averaging less than annually) seizures, which she always admitted to her treating physician were connected with alcohol abuse. She had multiple studies done when she was hospitalized related to excessive alcohol abuse and withdrawal symptoms; however the medical record reveals she had no MRI related to any complaint of back pain. She admits not making such a complaint. She testified she had been wearing a back brace for the last 15 years. No physician observed that she was wearing such a brace upon examination. If she had been, the physician most likely would have brought up back pain. Since she had regular monthly to quarterly appointments, she had multiple opportunities to mention back pain and the physician had just as many opportunities to observe the back brace. Her testimony of constant sharp back pain, from which she testified she was disabled, and not disabled by her seizures, is simply inconsistent with her failure to seek treatment when she was seeing a general practice physician for various other temporary or long-term issues on a regular basis. She also took no pain medication for any other condition. She testified that she had 2 seizures in the month of October 2009, and that these caused her to be "out of it" for 3 hours. She testified to having one or two grand mal seizures per month, and stated that she had talked with her doctor about these. However, at the October 9, 2009, appointment, after an August 2009 well woman examination, during which no seizures were mentioned, she stated she had had no seizures. Having reviewed the entire record, she denied seizures for periods of many years, interrupted by 3 total episodes of a seizure over the years from 2001, the last in September 2007. The last two were connected with excessive alcohol consumption and withdrawal. Thus, her testimony of seizures is inconsistent with her own statements throughout the medical record, and inconsistent with her statements in the same month as the hearing was held. She had no other allegations of disabling conditions and did not mention any problem with neck pain. . . . At the most recent appointment of record on January 8, 2010, the claimant made no mention of problems with seizures, or that she had any seizures since the last visit. If this evidence is accurate, the physician has not had the chance to appropriately treat the condition, as the most recent information she had from the claimant was that she was continuing to have no seizures for over a year.

At the hearings held before the undersigned the claimant had prepared 2 different documents entitled "Seizure Log" and submitted them as Exhibits 14E and 15E. She now testified to having "small" seizures in addition to grand mal seizures. There is no mention of differing types of seizures in the record.

She testified she last drank alcohol on January 7, 2009. When reminded that she admitted that she was drinking some alcohol at Exhibit 16F, pg. 8, in June 2009, she changed her testimony to state, "that was the first time I had fallen off..." She then testified she must have "slipped" in her drinking and went back to drinking for "like two days." However, at the time, she said she was drinking in the same rather moderate pattern she would admit to when she was previously hospitalized with multiple medical problems due to excessive alcohol abuse. She testified she attended Alcoholics Anonymous. She then changed [the] focus of the testimony. She stated in the same sentence that she now only smokes 4 to 5 cigarettes per day. The undersigned asked how life was since she was not drinking and had cut down her smoking so much. She responded, Good." She was asked what had changed as a result. She said, "My whole attitude, no depression, of course you never know which comes first, just life!"

29

Regarding back pain, she really could not describe any back pain. She said she sometimes had burning pain in her neck that stopped her in her tracks. Her doctor had given her yoga exercises for her pain. She testified that she had no limitations in sitting. She said she mostly sat around all day. She then testified she would need to alternate sitting and standing every 15 minutes, and after doing that for one hour, she would need to lie down. She ultimately testified she would be able to resume alternating sitting and standing after lying down for 10 minutes. She testified she could not lift a gallon of milk or a sack of potatoes. She admitted however that she had not spoken to her doctor about the back pain she now alleges has been so limiting to her. Regarding seizures, the claimant testified she had her first in 2001, and initially had them about once every 6 months. This testimony is inconsistent with the record indicating she had no seizure activity for a much longer period until she was going through alcohol withdrawal in 2007. She testified they have become more frequent. She stated she now gets grand mal seizures once a month, with recovery lasting the rest of the day, sometimes the next day as well. Apparently her testimony is that this commenced after her October 9, 2009 appointment when she denied ay seizure activity, as she had repeatedly. Once again, there is nothing in the medical record to support her testimony of this frequency. Even the post-hearing evidence fails to support her testimony of active seizures. She also testified to smaller seizures during which she loses consciousness and lasting only 3-4 minutes with recovery time of only 15 to 30 minutes. According to the claimant, these occur once a week. Her testimony and post-hearing "log" is the only evidence of such occurrences. She testified that no doctor ever said drinking was the cause of her seizures. She started Lamictal 2 to 2.5 years ago. She did not answer whether it had been effective, but said her physician put her on it because it had few side effects. She thinks it has cut the length of the seizures, and maybe their intensity. When asked which impairment interferes most with her ability to work, she said, "It's not the seizures, it's my back." She later testified they were probably equally limiting. When reminded of her chronic obstructive pulmonary disease and asked how that limited her, she testified she had periods during which she coughed uncontrollably. When asked what she did in a typical day, the claimant testified she tries to take a walk, about a block and turns around and goes back. She said she may have to rest or her back will "give out." Around the house she does the chores, but she said, "It takes her awhile." She does the shopping, but does not do the lifting. She drives. She has no problems driving. She watches television and reads, and goes to AA for entertainment. She does not have the money for movie tickets. Regarding the "seizure log," she testified she filled it out the day she was in the attorney's office. Both logs appear to be similarly generated, and not a document completed over time as a method of clear documentation of actual occurrences.

The claimant did not testify that her ability to walk was limited by COPD. The fact that she does the driving is a strong indication that she is not having the level of seizure activity she alleges. She testified that she had no warning of the seizures. If a physician knew that an individual had any seizure activity, they would be told to not drive until they had been seizure-free for six months. Further, if an individual were having the number and length of seizures the claimant alleges, without warning, it seems very, very likely that, as a matter of self preservation, she would not get behind the wheel.

\* \* \* \* \*

30

The medical expert concurs that there is no objective medical evidence to support the claimant's allegations of a back impairment. Therefore the claimant's testimony regarding limitations from back pain is not based upon any medically determinable impairment. She has not complained of or been treated for such an impairment throughout the entire period at issue. As a result, it does not pass muster under step one of the two-step credibility analysis.

The claimant only testified that sometimes her COPD caused her to cough uncontrollably. She did not testify to any other limitations. She has had very few problems with upper respiratory infections, has not been treated with complaints of shortness of breath unrelated to these few problems, and has not indicated that this is a significantly limiting condition to her. However, the undersigned is limiting her to a range of sedentary exertional level work due to her combined impairments, and restricting the work environment to one free of concentrated airborne irritants such as dust, smoke, or fumes. In addition, the undersigned is finding that she could not work in temperature extremes of cold, heat or humidity, both due to her COPD, and possible neck problems.

As to any head injury causing a neck impairment, the claimant did not complain of this until very recently in the period at issue, and has gotten significant relief with mild pain medication. However, to prevent exacerbation of a possible neck impairment, and considering her COPD and the possibility of a seizure disorder unrelated to alcohol, the undersigned limits her to sedentary exertional level work. This is also consistent with her original testimony that she has no difficulty sitting, and spends her day sitting. Thereafter, her testimony changed twice. These changes are found not supported by the evidence, as she has no impairment which would limit sitting, and as they are inconsistent with her initial testimony. Finally, there is nothing in the record to support limitations in sitting. Since she is capable of doing the shopping and housekeeping, and caring for her disabled roommate, a sedentary exertional level residual functional capacity is more than reasonable. As a part of the sedentary limitation, but to reiterate, for the same reasons as set out above, she may not more than occasionally stoop, crouch, kneel, crawl, balance and climb stairs and ramps. She can frequently reach bilaterally at up to shoulder height, and frequently handle, finger and feel, grip and grasp. She can reach above shoulder height approximately once per day, if necessary, but not as a part of her regular job function, due to potential exacerbation of previous temporary neck pain, complained of. She cannot use air or vibrating tools due to the same potential exacerbation.

The claimant's seizure disorder has been discussed extensively above. Exhibit 14E is 2 sheets of legal pad paper with lines dated from April 12, 2008 through September 29, 2009, which purports to be a copy of the claimant's Seizure Log. She designates 3 types of seizures, "silent" and "small", in addition to "grand-m". In that 17 and 1/2 month period, the log shows 8 "silent", 19 "small" alleged seizures generally purported to last 1 to 3 minutes, with one set out at 4 minutes and one set out at 5 minutes. It also shows 5 "grand-m" alleged seizures, totaling 32 seizures, with times of seizure activity for the grand mal seizures showing one seizure lasting 10 minutes, two lasting 15 minutes and two lasting 20 minutes. This was presented for the October 2009 hearing. The second document presented January 15, 2010, was admitted by the claimant to have been created in her attorney's office on January 14, 2010. In this 3-month period, the

31

claimant alleged she had 6 "small" seizures of up to 18 minute duration and 3 "grand m" seizures, one 20 minutes long and two 25 minutes long. During this period from July 2009 through January 2010, the claimant was seeing a counselor. She talked about difficulty she was having quitting smoking. She talked about neck pain and her yoga exercises. She talked about how her life was going generally and specifically. She never once mentioned having a seizure, or problems with seizures. If the claimant were having anywhere near the type of seizure activity she has alleged, or most likely any seizure activity, she would have brought this up to her counselor. See Exhibit 17F.

Although the claimant has had a roommate who has allegedly timed the claimant's seizures, and described these to her, he has not felt it necessary to call for help or get the claimant to emergency treatment during any of the alleged episodes in Exhibits 14E and 15E. Although medical evidence was provided by the claimant's attorney through January 12, 2010, no hospital records are provided for the period after the end of October 2008. If her attorney felt these records would be helpful to the claimant or support her case in any way, or if she had in fact gotten additional treatment, the records would be available for the attorney to obtain. The records were not submitted into evidence. As a result, a negative inference is drawn, the claimant was not seen thereafter for seizures unrelated to alcohol abuse or withdrawal. Prior to that date, she was seen for alcohol-related seizure and ketoacidosis and not long prior to that, she passed out due to dehydration, also a symptom of her alcohol abuse. Further, these occurrences were in 2007, and prior to being treated for seizure disorder on any continuing basis.

Despite delineating the different types of seizures, apparently with the alleged help of her roommate, at the hearing, the claimant was unable to describe any difference between a "small" seizure and a "silent" seizure. She had difficulty describing anything about the seizure activity, or the occurrences after the seizure, such as whether she lost bowel and/or bladder control, whether she had injuries, whether she had a headache, etc. She did not write or have her roommate write any such information about any of the alleged seizures in the "Log." The only comment might be "down for two days" after listing a "grand-m" seizure or "down for 2 and 1/2 days." Her testimony was no more clear. The second document, Exhibit 15E, covers October 1, 2009 apparently through January 14, 2010. Other than the periods of time listed for the seizure activity being well beyond a normal time for seizure activity to occur, both logs were allegedly created during times when the claimant was getting regular medical treatment for seizures and denying seizure activity. If she were having such frequent and debilitating seizures and if she were keeping this journal showing this type of activity, she most certainly would have told her physician and shown her journal so that medication changes could have been made to minimize or eliminate the seizures. She did neither. The documents are found to have been created for purposes of obtaining disability benefits, and found not to be an accurate reflection of seizure activity.

* * * * *

The claimant has had some depression with anxiety symptoms, connected only with alcohol abuse. When she has had some documented periods of sobriety, she has had no complaints of symptoms from these disorders whether taking or not taking medication

32

for depression. She has not been referred for any real mental health treatment. She was recently in relatively short-term counseling in connection with her attempt to quit smoking. She has testified that she has no depression when she is not drinking alcohol. This is consistent with the record as a whole. The evidence indicates that she has some mild brain atrophy, consistent with long-term alcohol abuse. However, she has continued to show strong mental functioning when not actively abusing alcohol. She has no limitation in the ability to carry out instructions up to the svp level of 8 or 9, despite the mild atrophy of the brain as a result of alcoholism and the head injury, which have not been shown to have caused any appreciable decline in mental functioning. The claimant did not allege any such limitations.

Regarding other factors, the claimant had a long period of significant earnings However, commencing in 1995, her earnings declined rather than increased from over $34,000 to about $32,000. Then in 1996 she earned only about $7,000. From that point on, her earnings were sporadic with about $4,500 in 1997 and doubling the next year. By 1999 she earned over $12,000. However, in 2000, earnings were down again to $8,362. These low and sporadic earnings were prior to the alleged onset of disability without an alleged medical condition that would account for the loss of consistently high earnings. She earned almost as much in one of the years after her alleged onset of disability as she did in the lowest year above prior to her alleged onset of disability. From 1998 through 2001, she worked for various schools as a substitute teacher. For some reason, she either began to get fewer calls or to accept fewer assignments -- in 2000, and even more so in 2001. Jobs thereafter generally lasted for only one month, with one lasting up to three months. Such a record prior to the alleged onset of disability does not indicate that, but for a disabling medical condition, the claimant would be fully employed. It is also a record that could be consistent with an individual battling a very significant problem with substance abuse.

(Tr. at 24-29).

I find that the ALJ's very thorough credibility analysis is supported by the record as a whole.

Plaintiff takes exception to these comments: "[F]or some reason, she either began to get fewer calls, or to accept fewer assignments" and "[S]uch a record prior to the alleged onset of disability does not indicate that, but for a disabling condition, the claimant would be fully employed. It is also a record that could be consistent with an individual battling a very significant problem with substance abuse." Plaintiff criticizes the ALJ's analysis because he mentions seizures caused by both alcohol consumption and alcohol withdrawal. With respect to plaintiff's history of taking Dilantin and Lamictal, plaintiff argued that, "If a medical doctor

33

did not think that these were necessary, then they [sic] would not have prescribed these anti-seizure medications."

The ALJ identified inconsistencies between plaintiff's subjective allegations and the record as a whole. Subjective complaints may be discounted if the evidence as a whole is inconsistent with the claimant's testimony. Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006). While the ALJ found that plaintiff suffered from a seizure disorder, the ALJ did not find plaintiff's statements regarding the frequency credible. Plaintiff testified that she had one seizure every six months after her 1997 motor vehicle accident. However, in August 2007 plaintiff denied having had any seizures for seven or eight years (Tr. at 17, 502). In September 2007, plaintiff stated that she had experienced seven seizures in 15 years, which corresponds to one seizure every two years and not one every six months. The statement in September 2007 (that she had seven seizures in the past 15 years) was also inconsistent with her statement in August 2007 that she had not had any seizures for the past seven or eight years. Plaintiff prepared a seizure log stating that she had had 41 seizures between April 12, 2008, and January 7, 2010. However, the medical records during this time period do not reflect these seizures. Plaintiff received counseling between June 2009 and January 2010. The ALJ properly noted that plaintiff never described any seizures to her counselors and instead focused on her smoking and her relationship with her boyfriend.

Plaintiff claimed that she had had a seizure on April 12, 2008; however, on April 17, 2008 -- five days later -- she did not report having had any seizures since September 2007, or seven months ago. Plaintiff described a 15-minute long seizure on May 2, 2008, but did not report the seizure to her medical provider six days later on May 8, 2008. Plaintiff claimed to have had a seizure on July 3, 2008; but on July 9, 2008, she denied to her medical provider having had any seizures since September 2007, or ten months ago. The denial in the medical records that she had any seizures since September 2007 is inconsistent with her claimed

34

seizures on April 12, 2008; April 21, 2008; May 2, 2008; May 19, 2008; May 20,2008; June 15, 2008; and July 3, 2008, in connection with her disability applications. This seriously undermines her credibility. On August 13, 2008, plaintiff reported having a seizure on August 10, 2008; however, this date is not in plaintiff's seizure log. Plaintiff claims to have had a seizure on September 13, 2008; but she did not reference it to her physician three days later on September 16, 2008. Plaintiff claims she had a seizure on December 29, 2008, and January 3, 2009; but she did not report these seizures just a couple days later on January 6, 2009. Plaintiff called her physician on December 30, 2008 -- the day after an alleged seizure -- but did not mention the seizure. Plaintiff alleged a seizure on January 31, 2009, but did not report it on February 3, 2009. Plaintiff allegedly had five seizures between February 27, 2009, and April 21, 2009, but did not relay any of them to her doctor on May 4, 2009. Plaintiff allegedly had a seizure on October 6, 2009, but denied any seizures three days later on October 9, 2009. Plaintiff described a 25-minute grand mal seizure that had her down for two days on October 24, 2009. However, three days later, on October 27, 2009, she told her counselor that she was doing well. She did not mention the seizure or having been down for two days. Plaintiff alleged that she had a seizure on January 7, 2010, but the next day did not report having had that seizure. Overall, it is clear that plaintiff's seizure log was not accurate.

Plaintiff argues that if she did not suffer from a seizure disorder, her physician would not have prescribed anti-seizure medication. However, plaintiff was not on any anti-seizure medication for four years during the relevant time period, and she testified that she had been on the same dosage of the same medication for a year and a half. Plaintiff's argument goes both ways -- had her doctor believed she was in need of anti-seizure medication, the doctor would have prescribed it. And had the doctor believed plaintiff continued to have weekly seizures while on this one medication, she presumably would have increased the dosage or added other medications in an attempt to better control plaintiff's seizures. Additionally, the

35

ALJ did find that plaintiff suffers from a seizure disorder, but found that the seizures were not as frequent as she alleged. Finally, the medical records reflect only one instance of plaintiff being warned not to drive due to seizures, and that was in September 2007. In a supplemental questionnaire, plaintiff reported that no one has ever advised her not to drive. During the hearing, plaintiff testified that she drives; and the only problem she named with traveling long distances (like from Springfield to St. Louis) was squirming because of having to sit for so long in the car. Plaintiff's decision to drive and the lack of driving restriction from her treating physician undermine her claims regarding the frequency of seizures.

The ALJ properly reviewed plaintiff's statements regarding her sobriety and found them inconsistent with the record. The record shows that plaintiff consistently minimized her alcohol use. In August 2007, plaintiff claimed that she had only had two drinks; however, her blood alcohol level was four times the legal limit. In September 2007, plaintiff was admitted as unresponsive to the hospital and her fiancé said that she had had a bit too much beer the night before. Plaintiff later stated that she only drank five beers at most, two days a week; however, the medical provider doubted her statements given the "quite high" MCV level. Plaintiff had a seizure on September 27, 2007, and she told the doctor that she had not consumed alcohol in 25 days. The ALJ properly noted that nine days after her discharge, plaintiff admitted that she had last consumed alcohol ten days earlier. This later admission is inconsistent with previous statements regarding her alcohol use. Plaintiff testified that she had not consumed alcohol since January 7, 2009; however, when reminded of the June 2009 medical records she admitted that she must have "slipped." Her testimony regarding January 7, 2009, being her last consumption of alcohol is also inconsistent with her testimony at the first administrative hearing when she said she quit on January 31, 2009, and is inconsistent with her admitted "slip." On January 6, 2009, plaintiff's treating physician confronted her about smelling of alcohol at 9:45 a.m. At that time, plaintiff stated she had not had anything to drink since

36

January 1, 2009. Further, she said intended to stay sober; however, based on her testimony, she drank alcohol the very next day.

Plaintiff argues that her alcohol "only" exacerbated her epilepsy. However, the ALJ did not find that plaintiff did not have seizures absent her alcohol abuse. Rather, the ALJ found that plaintiff's misstatements regarding her alcohol abuse undermined her credibility. See Karlix v. Barnhart, 457 F.3d 742, 748 (8th Cir. 2006) ("[T]he ALJ found Karlix unreliable because his testimony at the administrative hearing regarding his consumption of alcohol conflicted with medical documentation. This was a sufficient reason for discrediting Karlix, and we defer to the ALJ's judgment on this issue.").

Despite plaintiff's seizure disorder, she testified that her back pain was the impairment that prevented her from working more than her seizures (Tr. at 20, 24-26, 46-47, 61, 133-34). The ALJ properly considered plaintiff's complaints of lower back pain and found them unsupported by the medical records. See Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003) ("[T]he ALJ concluded, and we agree, that if her pain was as severe as she alleges, [plaintiff] would have sought regular medical treatment."). Plaintiff admitted that she did not seek any treatment from a doctor for her lower back pain. Her reason -- that she was afraid what she would be told -- makes no sense considering the fact that plaintiff had no fear of reporting neck pain to her doctor. The medical expert testified that the record was "virtually absent" of any mention of lower back pain. This is despite plaintiff having received almost monthly treatment from the Kitchen Clinic during the relevant time period. See McCoy v. Astrue, 648 F.3d 605 (8th Cir. 2011) ("[A]lthough McCoy regularly visited doctors . . ., he rarely mentioned any pain or limitation in movement of his back . . . ."). Plaintiff admitted to her counselor that yoga stretching helped her pain. An impairment that can be controlled with medical treatment cannot be considered disabling. Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009); Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004). The ALJ also noted that

37

plaintiff's statement regarding the use of a back brace for 15 years was unsupported by the record. As explained by the ALJ, no medical provider ever noted that plaintiff was wearing a back brace. If plaintiff had worn a back brace for 15 years, one would reasonably expect to see some notation in medical records that such a brace was observed during that time period.

Plaintiff's daily activities belie her claim of total disability. Plaintiff claimed in her administrative paperwork that she could care for her disabled roommate, prepare meals, perform household chores, wash laundry and dishes, grocery shop, drive, read, watch television, and attend Alcohols Anonymous meetings. "Acts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking are inconsistent with subjective complaints of disabling pain." McCoy v. Astrue, 648 F.3d at 614, citing Medhaug v. Astrue, 578 F.3d 805, 817 (8th Cir. 2009). Additionally, plaintiff's ability to care for a disabled individual is inconsistent with her allegation of disability. Brown v. Barnhart, 390 F.3d at 541.

The ALJ properly considered plaintiff's motivation to receive disability benefits, her attempts to find work, and her work history in evaluating her credibility. Plaintiff told her counselors that she wanted to receive disability benefits so that she could move out of her boyfriend's apartment and get a place of her own. Evidence of secondary gain is relevant in determining a claimant's credibility. Eichelberger v. Barnhart, 390 F.3d 584, 590 ("[T]he ALJ found that Eichelberger had objectively determinable impairments, but also noted that her incentive to work might be inhibited by her long-term disability check of $1,700 per month); Gaddis v. Chater, 76 F.3d 893, 896 (8th Cir. 1996) (allowing an ALJ to judge credibility based on a strong element of secondary gain). Plaintiff's counselor's notes also show that plaintiff was looking for work during the relevant time period (Tr. at 20, 757-59, 777, 781). Plaintiff wanted to return to work as a substitute teacher, which her counselor encouraged her to do (Tr. at 20, 757-59, 777, 781). Plaintiff's counselor also suggested that she apply for other jobs (Tr. at 20, 759, 781). However, looking for work is inconsistent with allegations of disability.

38

Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995); Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mitchell v. Sullivan, 907 F.2d 843, 844 (8th Cir. 1990). Plaintiff admitted that she had difficulty finding a job because of the recession, and her reasons for leaving the employment after her alleged onset date were not related to her impairments but for other reasons including that seasonal work had ended. These are appropriate factors weighing against plaintiff's credibility. Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003) ("Since the evidence supports a finding that Mr. Depover left because the job ended, we believe that it was not unreasonable for the ALJ to find that this work 'suggests that his impairments are not as severe as alleged.") The ALJ noted that plaintiff's earnings were sporadic after she lost her job at McDonnell Douglas -- the low earnings in her employment record do not coincide with her alleged onset date.

Based on all of the above I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's subjective allegations of disabling symptoms are not credible.

VII.    OPINION OF TREATING PHYSICIAN

Plaintiff argues that the ALJ erred in giving little if any weight to the opinion of plaintiff's treating physician as outlined in the Medical Source Statement.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion: (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the

39

opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. §

404.1527(d)(2) - (5).

> The ALJ had this to say about Dr. Dasovich at the Kitchen Clinic:

> The claimant's treating physician completed a Medical Source Statement. However, as noted by the Medical Expert, this Statement is not supported by the objective evidence. It is not supported by the physician's own treatment notes and records, and is inconsistent with the evidence of record regarding an allegation of back pain. There is simply no objective support of record for any impairment that would support the allegations. It appears that, at least in part, Dr. Dasovich completed the Statement as the claimant asked her to complete it. This is often the case with a long-term treatment relationship. The physician knows that their patient needs to continue receiving medical treatment. They want the claimant to continue to qualify for Medicaid, the physician is in a hurry. The patient presents a form to the physician and states what he or she wants the form to indicate. The physician complies to various degrees. The Statement contains no diagnosed conditions to support the limitations and these are not found in the treatment record. The undersigned gives the Statement little weight.

(Tr. at 30).

Clearly the most important factors here are supportability by medical signs and laboratory findings and consistency of the opinion with the record as a whole. Nearly every restriction found by Dr. Dasovich was extremely severe and was due to back pain: Her finding that plaintiff could never lift even ten pounds, could stand or walk for less than two hours per day, could sit for less than six hours per day, must periodically sit and stand to relieve pain, and her limitation in pushing or pulling with her lower extremities are due to "severe lower back pain." Her inability ever to handle or to finger and feel more than occasionally are due to "lower back pain". There is only one mention of lower back pain in all of Dr. Dasovich's records, and for that Dr. Dasovich recommended a non-steroidal anti-inflammatory. Dr. Dasovich found that plaintiff could never crouch due to knee pain. However again, Dr. Dasovich never treated plaintiff for knee pain and her notes do not reflect that plaintiff ever complained of knee pain. Significantly, Dr. Dasovich did not mention seizures anywhere in this Medical Source Statement, even though that is the primary condition for which she presumably was treating plaintiff.

The ALJ's comments about some doctors filling out forms in accordance with their patients' instructions are not relevant to plaintiff's case. The ALJ did not rely on this observation in determining whether to give any weight to the Medical Source Statement. He merely pointed out what he has no doubt seen over his years on the bench. Regardless of those comments, he was justified in discounting this Medical Source Statement as it is contradicted by the doctor's own treatment records and all of the other medical evidence in the record.

## VIII. QUESTIONING VOCATIONAL EXPERT

Finally plaintiff argues that the ALJ erred in directing the vocational expert not to answer counsel's question and in directing counsel to rephrase. This argument is without merit.

Plaintiff's attorney asked the vocational expert the following question:

I guess there is this one question. The judge basically set forth the restrictions on 17F [Dr. Dasovich's opinion]. You saw that? That's the basis for your last --. But one quick question. You heard the doctor's testimony, correct? I wasn't clear on his testimony on, well strike that. Based on this testimony, would any of the jobs that you've mentioned be available?

(Tr. at 118).

The ALJ said, "I'll direct the witness not to answer that, since he is indeed a medical expert. It covered a wide range of subjects, and it's beyond the expertise of this witness. But counsel, you may rephrase." The attorney refused to rephrase the question, and the hearing concluded (Tr. at 118-119).

The medical expert testified for a long time, his testimony covering 44 pages of the administrative transcript. He never testified about any of plaintiff's abilities. He did not testify that plaintiff could or could not walk, stand, or sit for any length of time. He never rendered an opinion about what functional limitations or abilities plaintiff had. Instead, he testified about the medical conditions that appear in the medical records, he explained procedures and treatments and medications, and he compared the medical records to plaintiff's testimony.

41

There is no way the vocational expert could say whether a person "based on the medical expert's testimony" could do any particular job. The ALJ stated that the question was not a proper question and gave the attorney a chance to rephrase the question. Despite having indicated that he himself was "unclear" on the medical expert's testimony, counsel chose not to rephrase his question. This was no error on the part of the ALJ.

IX.  CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision finding plaintiff not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
January 30, 2012

42